CHAPMAN COMPANY, INC., APPELLEE, v. WESTERN NEBRASKA BROADCASTING CO., INC., ET AL., APPELLANTS.

329 N.W.2d 107

Filed January 14, 1983. No. 81-744.

Thomas D. Brower and Paul E. Hofmeister of Van

Steenberg, Brower, Chaloupka, Mullin & Holyoke, for appellants.

Harris & Lippstreu, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, HASTINGS, and CAPORALE, JJ.

KRIVOSHA, C.J.

The instant appeal presents to the court a question of first impression concerning the proper interpretation of a broker's contract for the sale of a business. Following trial to a jury a verdict was returned by the jury in favor of the broker, Chapman Company, Inc., and against the owners of radio station KEYR in the amount of $21,650. For reasons which we more particularly set out in this opinion, we believe that the instruction given by the court to the jury was erroneous and therefore the verdict of the jury must be set aside and a new trial granted.

The undisputed record discloses that the appellants, Western Nebraska Broadcasting Co., Inc. (Western), Guy W. Embree (Embree), and Richard W. Baumgartner (Baumgartner), jointly referred to as (Western), owned and operated radio station KEYR in Terrytown, Nebraska. At some point they determined that they wished to sell the station and listed it with the appellee, Chapman Company, Inc. (Chapman), a broker engaged in the business of selling radio stations. In connection with this listing Western signed an exclusive brokerage agreement with Chapman on August 11, 1977. The agreement gave Chapman the exclusive right to sell the stock of Western and gave Western the right to terminate the contract at any time after the contract had been in effect 60 days, upon giving 30 days' notice. The evidence discloses the agreement to be a fairly simple document, setting out that Western was desirous of selling all of its stock for the price of $380,000. Under the terms of the agreement Chapman was likewise to perform certain activities on behalf of

Western for the purpose of selling the stock. The agreement provided for a schedule of compensation to be paid by Western to Chapman in the event of a sale. The agreement further contained a provision which is the issue of this lawsuit. The contract specifically provided that even if the agreement was terminated, "[o]n any sale during the ensuing 12 months to a prospect *solicited* by Broker during the authorization, Broker is to be paid the same commission." (Emphasis supplied.) The agreement does not define the term "solicit," and it is this absence of a definition which causes the difficulty. The provision quoted is what is generally referred to in the trade as an "extension clause" and, according to the evidence, is intended to protect the broker in the event that he obtains a purchaser for the owner and the parties simply delay closing until after the listing agreement expires. See, *Whiting v. Johnson,* 64 Wash. 2d 135, 390 P.2d 985 (1964); Annot., 51 A.L.R.3d 1149 (1973).

The evidence further discloses that in January of 1977 Chapman had been contacted by a James Bickling, who was interested in buying a radio station in the Montana, Minnesota, North Dakota, or South Dakota areas. At this same time Bickling also contacted four other radio station brokerage firms advising them of his interest in purchasing a radio station in that four-state area. On January 24, 1977, he completed and returned Chapman's "buyer outline" form in response to a request for more specific information. Over the next 1½ years, Bickling received numerous mailings from all five brokers with regard to various radio properties. In August of 1977, pursuant to the broker agreement, Chapman initiated a mass mailing to 171 potential buyers, including Bickling, announcing that KEYR was available for purchase. Bickling denies ever receiving this initial offering letter. It is, in any event, undisputed that he made no response to such letter even if, in fact, he received it.

On January 12, 1978, Western notified Chapman of its desire to terminate the listing contract with Chapman, effective March 1, 1978. Following receipt of the notice Chapman sent out a second mass mailing on January 16, 1978, to an additional 152 people, bringing the total number of names on its mass mailing list to 323. This list was later mailed to Western in response to Western's request for a list of "prospects."

On March 16, 1978, Embree and Baumgartner listed KEYR with another radio brokerage firm by the name of Dan Hayslett & Associates. The evidence discloses that, by sheer coincidence, Hayslett had purchased the assets of a brokerage firm that Bickling had contacted in January of 1977. The assets purchased by Hayslett included a mailing list which contained Bickling's name as a potential buyer of radio stations.

On April 3, 1978, Hayslett sent out letters and brochures to buyers it thought might be interested in purchasing KEYR. This mailing was received by Bickling and, according to Bickling's testimony, was the first notice he had that KEYR was for sale. Shortly thereafter, Bickling contacted Hayslett and preliminary negotiations began. The final agreement for the purchase of KEYR was signed on August 28, 1978, and the sale was consummated on November 1, 1978. Chapman admittedly was in no way involved with any of these negotiations or with the completion of the sale of KEYR to Bickling.

In September of 1978 Chapman read of the sale of KEYR in BROADCASTING MAGAZINE. As a result of that, he wrote a letter to Embree and Bickling requesting payment of the broker's commission as provided for in the listing contract. He maintained that Bickling was one of the 323 individuals that Chapman had "solicited" during the term of the agreement and that by reason of the extension clause he was entitled to be paid. Embree and Baumgartner rejected the claim and instead paid

the commission to Hayslett. Thereafter, Chapman instituted this action. While a number of issues are raised, both by Western and by Chapman, the seminal question which must be addressed is whether Chapman "solicited" Bickling within the meaning of the broker agreement so as to entitle Chapman to a commission in the amount of $21,650 when Bickling purchased KEYR from Western through Hayslett. Chapman argues that under the terms of the agreement all Chapman was required to do to earn its commission was to "solicit" or "contact" someone who purchased the station during the 12-month period, even if Chapman had no other contacts with the purchaser. The determination of the question in this case, therefore, depends upon the correctness of the trial court's instruction No. 7. By instruction No. 7, the trial court instructed the jury as follows: "The word 'solicit' means 'to ask, to urge, to appeal (for something), to invite, to try to obtain or to furnish information designed to persuade a person to do a particular. act.' 'Solicit' does not imply successful solicitation or require a response. Solicitation does not require any particular form nor does it require a particular degree of earnestness or persistance [sic]." If instruction No. 7 correctly reflects the law in Nebraska, then the verdict of the jury was correct. If, however, the instruction was not correct because the jury needed to be instructed that something more than an unsuccessful and unresponsive solicitation was required, then the verdict must of necessity be set aside. As we indicated at the outset, we believe that the instruction was not correct and therefore the judgment must be set aside.

Investigation discloses that there appears to be no specific Nebraska decision deciding what the word "solicit" in a business brokerage contract of this type means. In construing extension clauses other courts have generally resorted to two approaches in determining whether the broker is entitled to the commission claimed by reason of the "extension

clause." One group, though by far the minority, has taken the position that the broker need only establish that his activities and efforts met or measured up to the conditions specified in or required by the language of the clause in question. These courts have made it clear that the parties to a listing contract are free to frame their agreement in whatever terms they may see fit, provided that such terms are neither unlawful nor contrary to public policy, and that in so doing they may make a broker's right to compensation depend upon the happening of any designated event or upon the fulfillment of any particular set of circumstances, even though neither the event nor the circumstances result in procuring a purchaser. The theory of those cases apparently is that if the owner wishes to impose a greater obligation on the broker, he should specify it in the agreement. See, *Galbraith v. Johnston,* 92 Ariz. 77, 373 P.2d 587 (1962); *Leonard v. Fallas,* 51 Cal. 2d 649, 335 P.2d 665 (1959); *Delbon v. Brazil,* 134 Cal. App. 2d 461, 285 P.2d 710 (1955); *Wright & Kimbrough v. Dewees,* 52 Cal. App. 42, 197 P. 957 (1921); *Moore v. Holman Real Estate Co.,* 129 Ark. 465, 196 S.W. 479 (1917). In essence, this is the position which Chapman convinced the trial court to take and which is now urged upon us.

The majority of the courts, however, have not been willing to accept so unlimited a definition for the word "solicit" in a broker's agreement. Instead, the majority of courts have held that before a broker may be entitled to a commission, the broker must ordinarily be able to establish at least some causal connection between the broker's actions and efforts in regard to the listed property and the ultimate sale made to the purchaser under an extension contract of the type involved herein. While those courts have not gone so far as to require a showing that the broker was the "procuring cause" of the sale, unless the contract contained specific language making it incumbent upon the broker to be the pro-

curing cause, they have required more than just a blanket mailing even to a selected group. The nexus between the broker's efforts and the ultimate sale will vary with the language of the clause in question. In every instance, however, more is required than a mere unresponded to solicitation by mass mailing, as was done in this case. See, *Harkey v. Gahagan,* 338 So. 2d 133 (La. App. 1976); *Lloyd Hammerstad, Inc. v. Saunders,* 6 Wash. App. 633, 495 P.2d 349 (1972); *Korstad v. Hoffman,* 221 Cal. App. 2d 805, 35 Cal. Rptr. 61 (1963); *Mellos v. Silverman,* 367 So. 2d 1369 (Ala. 1979).

As we indicated at the outset, there appears to be no Nebraska case directly on point. In attempting to reach what we perceive to be an appropriate balance between protecting the rights of the broker, on the one hand, under such a "soliciting contract" and yet providing the owner of the property with some reasonable protection, on the other, we believe that the better-reasoned cases by far are those which have required that before a broker may recover for "soliciting" the broker must show some causal relation between his efforts and the ultimate sale. The language of the Louisiana Court of Appeals in the case of *Harkey v. Gahagan, supra* at 135, best explains that reason when it points out: "The purpose of the. extension clause in a real estate listing contract is to insure the realtor's right to a fee when the property owner sells the property subject to the listing after the expiration of the primary term to a purchaser who had been located or otherwise interested in the property by the realtor's effort. The realtor does not have to be the procuring cause in order to activate the extension clause. He need not have been involved in active negotiation with the purchaser at the time of the expiration of the primary term. However, his activities must have been the cause of creating some minimal interest in the purchaser which contributed to bringing about the eventual sale." We see little difference between a

contract to sell real estate and a contract to sell a business. We believe that this notion that the broker must have been "the cause of creating some minimal interest in the purchaser" is indeed the appropriate balance between the argument made by Chapman, on the one hand, that consenting adults ought to be permitted to enter into unambiguous agreements as they choose and the argument of appellants, on the other hand, that merely permitting one to send out a mass mailing should be insufficient to constitute a solicitation sufficient to entitle a broker to receive a commission. Obviously, were we to adopt the position taken by Chapman, and apparently accepted by the trial court, every broker need only send out a letter to every individual on a mass mailing list and thereafter be protected from any sale which might occur during the extension period. We believe that such a rule would serve no useful purpose and would only burden the owner's right to dispose of his property in spite of the original broker's inability to provide an interested buyer. We believe that the minimal contact rule is the rule which provides the best balance, and we now adopt that rule for this jurisdiction. The rule, therefore, in this jurisdiction is to the effect that where a broker and the owner of a business enter into a brokerage agreement which contains an extension clause entitling the broker to the payment of a commission in the event a sale occurs after termination of the brokerage agreement, but during the extension period, to any "prospect solicited by the broker during the contract period," the broker must show some minimal causal connection between the efforts of the broker and the ultimate sale before the broker may receive the compensation. Because of our holding, we must find that the court's instruction No. 7 was erroneous, and therefore we must reverse the judgment and remand this action back to the District Court with instructions to retry the case

in accordance with this decision.

REVERSED AND REMANDED FOR A NEW TRIAL.

CLINTON, J., not participating.