BUSINESS CONSULTING SERVICES,
INC. d/b/a Hawkeye Business
Brokers, Appellee,

v.

Leroy WICKS, Appellant.

No. 04–0002.

Supreme Court of Iowa.

Sept. 9, 2005.

Michael L. Jankins of Murray, Jankins & Noble, Des Moines, for appellant.

William B. Serangeli and Jeffry K. Clayton of Smith, Schneider, Stiles & Serangeli, P.C., Des Moines, for appellee.

PER CURIAM.

Leroy Wicks, as seller, and Hawkeye Business Brokers Company (Hawkeye), as broker, entered into a listing contract for the sale of Wicks' business. When Wicks refused to pay a commission as demanded by Hawkeye, Hawkeye sued and obtained a judgment against Wicks. We reverse and remand.

## I. *Facts and Prior Proceedings.*

Hawkeye is a company, called a "business broker," that provides brokerage services to buyers and sellers of businesses, similar to the services of a real estate broker. Wicks is a Des Moines businessman who owned a security business called Homeguard Security, providing antitheft and antiburglary security services for homes and businesses.

The contract relationship between Wicks and Hawkeye began when Joy Jones—one of Hawkeye's brokers—learned that Wicks was interested in selling Homeguard. Ironically, Jones acquired this information from the person who ultimately purchased the business—David Gutfreund. Gutfreund had previously been the general manager for Per Mar Security Company, a company that worked closely with Homeguard by providing monitoring services for alarm calls triggered by Homeguard's alarms. Gutfreund left Per Mar in December of 2001. After Gutfreund left Per Mar, he contacted Jones and told her that he was interested in locating a business, that Homeguard was for sale, and that he was interested in purchasing a business "like" Homeguard. Gutfreund did not feel he could purchase Homeguard, however, because his attorney had advised him that doing so might create a conflict of interest with Per Mar because of Gutfreund's former employment at Per Mar.

After she learned that Wicks was selling Homeguard, Jones contacted Wicks and offered to assist him with the sale. On January 24, 2002, Wicks and Jones (on behalf of Hawkeye) signed a listing agreement, which was to run until March 24, 2002. The listing contract was nonexclusive, but if Jones produced a ready, willing, and able buyer during the listing period, Wicks would pay Hawkeye a ten percent commission.

Additionally, the agreement contained an "extension clause" that provided:

> Seller agrees to pay the full commission set forth in this Agreement to the Broker in the event the property described herein is within one year after the termination of this Agreement, sold, traded or otherwise conveyed to *anyone referred to Seller by the Broker* or with whom Seller had negotiations during the term of this Agreement.

(Emphasis added.)

Generally speaking, an extension clause is intended to afford a measure of protection to a broker against an unscrupulous and fraudulent attempt on the part of a property owner to secure the advantage of the broker's services and yet avoid paying him a commission through the device of delaying sale of the listed property to a purchaser interested therein by the broker until after the expiration of the listing agreement. On the other hand, and in somewhat the same manner as such an extension clause provides protection to a broker, the imposition of a fixed and definite limitation upon the interval of time in which the broker has the authority—and particularly where he has the exclusive authority—to deal with the designated property, safeguards the owner from claims by the broker for a commission upon any sale of the property consummated after the expiration of such time

limit regardless of whether or not such sale resulted from the broker's efforts. J.R. Kemper, Annotation, *Construction of Provision in Real–Estate Broker's Listing Contract that Broker Shall Receive Commission on Sale After Expiration of Listing Period to One With Whom Broker has "Negotiated" During Listing Period,* 51 A.L.R.3d 1149, 1175 (1973) [hereinafter Kemper, *Extension Clauses* ].

The listing contract also had a clause, handwritten, stating that "Seller will not accept less than $600,000." The business sold for less than that, and Wicks raises this as a second issue on his appeal—that Hawkeye did not meet the terms of the contract. There is some doubt as to whether Wicks preserved error on this issue, but in any event, we need not address it because we resolve Wicks' appeal on another ground.

The district court made no finding with respect to any negotiations instituted by the broker, and it does not appear the business was actually "shown" by the broker to the buyer. In fact, except for the broker's revelation to the buyer that the business was for sale—a fact the buyer already knew—the broker did virtually nothing to bring the sale to fruition. The broker testified that she encouraged two potential buyers, including Gutfreund, to bid on the property. Also, she spent approximately forty-five minutes meeting with Wicks and corresponded with him in connection with "confidentiality agreements." She could not recall whether she had advertised the business.

Pursuant to the terms of the extension agreement, Hawkeye sent a letter to Wicks reminding him of the terms of the extension agreement under which Wicks would be liable for a commission on any sale to a buyer referred by the broker. The letter listed Gutfreund as one of six parties to whom Jones claimed to have "shown," and therefore referred, the property. Hawkeye informed Wicks that a sale to any of the six parties would result in liability for the commission.

## II.   *Standard of Review.*

When reviewing the judgment of a district court in a nonjury law case, our review is for correction of errors at law. The trial court's findings have the effect of a special verdict and are binding if supported by substantial evidence. Evidence is substantial when a reasonable mind would accept it as adequate to reach a conclusion. *Hansen v. Seabee Corp.,* 688 N.W.2d 234, 237–38 (Iowa 2004).

## III.   *Analysis.*

In Wicks' first argument, he contends the district court erred in ruling for Hawkeye because it did not establish that Hawkeye was the "efficient procuring cause" of the sale. Under common law, a broker is entitled to a commission, even if the sale occurs after the termination of the brokerage agreement, if the broker is the "efficient procuring cause" of the sale. *McCulloch Inv. Co. v. Spencer,* 246 Iowa 433, 437–38, 67 N.W.2d 924, 927 (1955); *Kellogg v. Rhodes,* 231 Iowa 1340, 1344–45, 4 N.W.2d 412, 415 (1942); *see Mellos v. Silverman,* 367 So.2d 1369, 1371 n. 1 (Ala. 1979) ("Procuring cause refers to a cause originating with a series of events which without break in their continuity result in procuring a purchaser ready, willing and able to buy on the owner's terms.").

Under the "procuring cause rule," a party may be entitled to a commission on a sale made after the termination of a contract if that party procured the sale through its activities prior to the termination, but such rule applies only if the

contract does not expressly provide when a commission will be paid.

12 Am.Jur.2d *Brokers* § 270, at 918 (1997).

■ The "efficient procuring cause" doctrine only applies if the contract between the parties is silent on the issue of a sale after the expiration of the original listing period. In other words, it is the default rule. *See id.* It is said that

> the courts have ... made it clear that the parties to a listing contract are free to frame their agreement in whatever terms they may see fit—provided that such terms are neither unlawful nor contrary to public policy—and that in so doing they may make a broker's right to compensation depend upon the happening of a designated event, or upon the fulfillment of a particular set of circumstances, rather than upon the procurement of a purchaser.
>
> Such, in essence, is the position which has been taken by a number of courts which have held ... that where an extension clause in a listing contract provides for payment of a commission to a broker upon a sale of the listed property, after the expiration of such agreement, to a party with whom, during the term thereof, the broker had negotiated (or had otherwise dealt, as required by the particular language of the clause), the broker is not required, in order to be entitled to a commission, to show that he was the "procuring cause" of such sale....

Kemper, *Extension Clauses*, 51 A.L.R.3d at 1168; *see Mellos,* 367 So.2d at 1371 ("Under the language typically employed in extension clauses, it is not necessary that the actions of the brokers be the 'procuring' cause of the sale ...."); *accord Galbraith v. Johnston,* 92 Ariz. 77, 373 P.2d 587, 589 (1962); *Leonard v. Fallas,* 51 Cal.2d 649, 335 P.2d 665, 668 (1959); Restatement (Second) of Agency § 448 cmt. b, at 356 (1958). We agree with this general rule and hold that, because the listing agreement between Hawkeye and Wicks contained an extension clause, its terms are controlling on the "referral" issue, and Hawkeye need not prove it was the efficient procuring cause.

The question remains whether Hawkeye complied with the terms of the agreement. That turns on whether Hawkeye's "referral" of Gutfreund without any proof of a causal connection with the ultimate sale was sufficient to comply with the terms of the agreement. We decide this issue as one of law, setting aside a very legitimate question of fact raised by Wicks, i.e., whether Hawkeye actually "referred" Gutfreund to Wicks in view of the fact that Gutfreund was the one who first broached the subject of his desire to purchase a security company and specifically mentioned to Hawkeye that Homeguard was for sale.

"Refer" is not defined in the contract, and the contract does not set out the conditions under which the broker will be considered to have referred the buyer to the seller. Hawkeye does not claim a causal relationship between its referral of Gutfreund and the ultimate sale, arguing that it was not necessary under the parties' contract to show any more than the fact that a sale was ultimately made to a buyer referred to Wicks by Hawkeye.

We believe that words such as "referred," "solicit," or similar words [1] necessarily incorporate an unexpressed, but inferentially essential, requirement that a broker do more than merely refer or point

---

1. *See, e.g., Korstad v. Hoffman,* 221 Cal. App.2d Supp. 805, 35 Cal.Rptr. 61, 62 (1963) (clause applied to party to whom broker "introduced" the property; "introduction" of property without connection to sale held insufficient).

a potential buyer to a seller. If such a requirement is not read into such words, they are too general to have any real meaning. Authorities illustrating this point are discussed later.

In contrast to vague words such as "referred," extension clauses providing commissions for sales to buyers "procured" by a broker have been held to be enforceable. *See Moore v. Prindable,* 815 S.W.2d 25, 27–28 (Mo.Ct.App.1991). This is understandable because words such as "procured," in contrast to a word such as "referred," are well-defined terms in real estate sales law. Similarly, an extension agreement allowing a commission for sales to a broker if the property is "contracted by or through the broker" has been held to be enforceable. *See Ira E. Berry, Inc. v. Sloan,* 662 S.W.2d 922, 924 (Mo.Ct.App.1983); *see also* Kemper, *Extension Clauses,* 51 A.L.R.3d at 1181 ("[P]erhaps the one most frequently employed is the word "negotiate," or some form thereof, such as "negotiated with" or "had negotiations with." ").

In *Chapman Co. v. Western Nebraska Broadcasting Co.,* 213 Neb. 322, 329 N.W.2d 107 (1983), an extension clause provided for a commission to be paid for a sale to anyone "solicited" by the broker. The broker mailed announcements of the proposed sale to 323 potential purchasers. One of the recipients of the mailed notice eventually purchased the business but the broker had no part in negotiations or the ultimate closing of the sale. *Chapman,* 329 N.W.2d at 109. The court agreed that the broker had in fact "solicited" the buyer, but that was not enough because

> the broker must show some minimal causal connection between the efforts of the broker and the ultimate sale before the broker may receive the compensation.

*Id.* at 111. The court noted that the requirement for a causal connection was the clear majority rule. *Id.* Another source, discussing cases from several jurisdictions, notes:

> [I]n order for a broker to be entitled to a commission, under and in accordance with an extension clause, he must ordinarily be able to establish at least some causal connection between his actions and efforts in regard or relation to the listed property and the ultimate purchaser thereof, and with the sale eventually made to such purchaser.

Kemper, *Extension Clauses,* 51 A.L.R.3d at 1156.

We adopt the majority rule and hold that a broker seeking to recover under an extension clause must establish some causal connection between the broker's efforts and the eventual sale. This might include negotiations between the parties or actual assistance in the closing of the sale. In this case, Hawkeye has not shown it was involved in any negotiations or the closing of the sale. As the Nebraska court said in *Chapman,* a rule that would allow recovery for merely soliciting a buyer without requiring a causal connection with the sale would burden the owner's right to dispose of his property. 329 N.W.2d at 111. We agree, and we also believe it would be poor public policy to reward brokers who, through such mailings or other forms of mass communication, would receive a substantial commission without diligent effort toward the conclusion of a sale. While the broker in this case did not mass mail to prospects, but rather, limited her contacts to six possible buyers, the point remains that "referring," as the broker did in this case, without more, is insufficient. As the court observed in *Patterson v. Blair,* 123 Utah 216, 257 P.2d 944 (1953),

although the clause with which we are concerned is perfectly valid and to be invoked for the broker's protection in a proper case, it surely was not intended to benefit a real estate man who has done nothing, by conferring upon him a "windfall" commission because he casually or inadvertently mentioned the listing to someone who thereafter happened to purchase it in the normal course of affairs and quite independent of the broker's activities. If so, he might well content himself with letting everyone possible know of a listing in the hope that some such eventuality would inure to his benefit, instead of really working on selling the property.

*Patterson,* 257 P.2d at 946. The plaintiff has failed to establish a causal connection between its referral of the buyer and the ultimate sale. We therefore reverse the judgment of the district court and remand for dismissal of the plaintiff's petition.

**REVERSED AND REMANDED.**